**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ROBERT WATTERSON, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>   v.<br><br>CONSUMER REPORTS, INC.,<br><br>                Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Watterson ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.    Defendant Consumer Reports, Inc. ("Consumer Reports") rented, exchanged, and/or otherwise disclosed personal information about Plaintiff Robert Watterson's *Consumer Reports* magazine subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive advertisers. As a result, Mr. Watterson has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Mr. Watterson's Personal Reading Information (defined below), Consumer Reports violated Rhode Island's Video, Audio and Publication Rentals Privacy Act, General Laws § 11-18-32 (the "RIVRPA").

2.    Documented evidence confirms these facts. For example, a list broker, RMI Direct Marketing, offers to provide renters access to the Personal Reading Information of

2,622,938 subscribers from the "CONSUMER REPORTS Datacard" at a base price of "$110/M [per thousand]," (i.e., 11 cents apiece).



## CONSUMER REPORTS

| SEGMENTS | | PRICE |
|---|---|---|
| 2,622,938 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 103,418 | 30 Day Hotline Subs | $125.00/M |
| 228,890 | 60 Day Hotline Subs | $120.00/M |
| 396,675 | 90 Day Hotline Subs | $120.00/M |
| 983,882 | 6 Month Hotline Subs | $115.00/M |
| 2,622,938 | Active US Subs | $110.00/M |
| 54,291 | 30 Day Expires | $75.00/M |
| | Fundraiser Rate US | $75.00/M |
| | **counts exclude the state of Michigan** | |

**DESCRIPTION**

Published by Consumer Reports, an independent, nonprofit testing and information organization.

Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CR's mission has been to test products, inform the public and protect consumers.

Additional Charges:
Long Term Renewals     @ $15/M
New to File            @ $11/M

Preclearance is required for all first time uses. Please allow up to 3 weeks for approval.

**CR** ConsumerReports
Smarter choices for a better world

| ID NUMBER | |
|---|---|
| NextMark | 81301 |
| Manager | 92409 |

| UNIVERSE | |
|---|---|
| 2,622,938 | |

| LIST TYPE | |
|---|---|
| Consumer | |

| SOURCE | |
|---|---|
| DIRECT MAIL | |

| LIST MAINTENANCE | |
|---|---|
| Counts through | 05/31/2018 |
| Last update | 07/18/2018 |
| Next update | 08/06/2018 |

| SELECTS | |
|---|---|
| 1 Month Hotline | |
| 3 Month Hotline | |
| Active Subscribers | |
| Change of Address | 15.00/M |
| Former/Expired Subs | |
| Gender/Sex | 8.00/M |
| Hotline | |
| Long Term Renewals | 15.00/M |
| New to File | 11.00/M |
| Paid | 11.00/M |
| Renewals | 13.00/M |
| SCF | 8.00/M |
| Source | 11.00/M |
| State | 8.00/M |

*See* Complaint Ex. B.

3.      Consumer Reports also offers access to an "Enhanced Mailing List," which includes Personal Reading Information of Consumer Reports subscribers based on, but not

limited to, "age," "income," the "presence of children," "gender/sex," and whether the household

is "Spanish speaking."



## CONSUMER REPORTS ENHANCED

| SEGMENTS | | PRICE |
|---|---|---|
| 1,168,020 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 43,260 | 30 Day Hotline Subs | $125.00/M |
| 96,895 | 60 Day Hotline Subs | $120.00/M |
| 169,018 | 90 Day Hotline Subs | $120.00/M |
| 427,234 | 6 Month Hotline Subs | $115.00/M |
| 1,168,020 | Active US Subscribers | $110.00/M |
| | Fundraiser Rate | $75.00/M |
| | **counts exclude the state of Michigan** | |

**DESCRIPTION**

Published by Consumer Reports, an independent, nonprofit testing and
information organization.

Consumer Reports contains no outside advertising and does not sell
endorsements. Use of the Consumer Reports list in no way endorses a
mailer's products or services. Since 1936, CR's mission has been to test
products, inform the public and protect consumers.

Enhanced:
Automotive
Cat
Computers
Cooking
Do-It-Yourself
Dog
Gardening Outdoors
Health
Investment/Finance
Pet
Presence of Children
Spanish Speaking

**CR ConsumerReports**
Smarter choices for a better world

| ID NUMBER | |
|---|---|
| NextMark | 271856 |
| Manager | 143269 |
| UNIVERSE | |
| 1,168,020 | |
| LIST TYPE | |
| Consumer | 🖂 mail |

| SOURCE | |
|---|---|
| DIRECT MAIL | |
| LIST MAINTENANCE | |
| Counts through | 05/31/2018 |
| Last update | 08/22/2018 |
| Next update | 08/10/2018 |
| SELECTS | |
| 1 Month Hotline | |
| 3 Month Hotline | |
| Active Subscribers | |
| AGE | 15.00/M |
| Change of Address | 15.00/M |
| Enhanced | 15.00/M |
| Gender/Sex | 8.00/M |
| Hotline | |
| INCOME | 10.00/M |
| Paid | 11.00/M |
| Presence of Child | |
| SCF | 8.00/M |
| Source | 11.00/M |
| State | 8.00/M |
| Zip | 8.00/M |
| GEOGRAPHY | |
| USA | |

*See* Complaint Ex. C.

4.    Consumer Reports also offers access to its "Age 50+ Subscribers Mailing List"

at the same base rate of "$110.00/M."



**CONSUMER REPORTS AGE 50+ SUBSCRIBERS**

| SEGMENTS | | PRICE |
|---|---|---|
| 857,941 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 31,277 | 30 Day H/L Subs | $125.00/M |
| 70,274 | 60 Day H/L Subs | $120.00/M |
| 122,530 | 90 Day H/L Subs | $120.00/M |
| 314,702 | 6 Month Hotline Subs | $115.00/M |
| 857,941 | Active US Subs | $110.00/M |
| | Age (all orders) | + $15.00/M |
| | Fundraiser Rate - USA | $75.00/M |
| | **counts exclude the state of Michigan** | |

**DESCRIPTION**

Published by Consumer Reports.

Consumer Reports is an independent, nonprofit testing and information organization.

Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CR's mission has been to test products, inform the public and protect customers.

Additional Charges:
Long Term Renewals        @ $15/M
New to File        @ $11/M

**counts exclude the state of Michigan**

**CR** ConsumerReports
Smarter choices for a better world

| ID NUMBER | |
|---|---|
| NextMark | 208494 |
| Manager | 129519 |

| UNIVERSE |
|---|
| 857,941 |

| LIST TYPE |
|---|
| Consumer |

| SOURCE |
|---|
| DIRECT MAIL |

| LIST MAINTENANCE | |
|---|---|
| Counts through | 05/31/2018 |
| Last update | 08/22/2018 |
| Next update | 08/10/2018 |

| SELECTS | |
|---|---|
| 1 Month Hotline | |
| 3 Month Hotline | |
| Active Subscribers | |
| Age | 15.00/M |
| Change of Address | 15.00/M |
| Gender/Sex | 8.00/M |
| Hotline | |
| Income Select | 10.00/M |
| Long Term Renewals | 15.00/M |
| New to File | 11.00/M |
| Paid | 11.00/M |
| Renewals | 13.00/M |
| SCF | 8.00/M |
| Source | 11.00/M |
| State | 8.00/M |

*See* Complaint Ex. D.

5.        Rhode Island's RIVRPA clearly prohibits what Consumer Reports has done.

Subsection (a) of the RIVRPA provides:

> It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records which would identify the names and addresses of individuals, with the titles or nature of

> video films, records, cassettes, or the like, which they purchased,
> leased, rented, or borrowed, from libraries, book stores, video
> stores, or record and cassette shops or any retailer or distributor of
> those products, whether or not the identities and listings are kept in
> a remote computing service or electronic storage or the disclosure
> is made through or by a remote computing service.

R.I. Gen. Laws § 11-18-32(a).

6.      Accordingly, Plaintiff brings this Class Action Complaint against Consumer

Reports for its intentional and unlawful disclosure of its customers' Personal Reading

Information in violation of the RIVRPA, and for unjust enrichment.

## NATURE OF THE CASE

7.      To supplement its revenues, Consumer Reports rents, exchanges, or otherwise

discloses its customers' personal information—including their full names, titles of magazines

subscribed to, and home addresses (collectively "Personal Reading Information"), as well as

myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity,

income, religion, parental status, and political affiliation—to data aggregators, data appenders,

data cooperatives, and other third parties without the written consent of its customers.

8.      By renting, exchanging, or otherwise disclosing – rather than selling – its

customers' Personal Reading Information, Consumer Reports is able to disclose the information

time and time again to countless third parties.

9.      Consumer Reports' disclosure of Personal Reading Information, and other

personal, demographic, and lifestyle information is not only unlawful, but also dangerous

because it allows for the targeting of particularly vulnerable members of society.  In fact, almost

any organization can rent a customer list from Consumer Reports that contains a number of

categories of detailed subscriber information.  For example, almost any organization could rent a

list with the names and addresses of all *Consumer Reports* customers who are Spanish speaking,

female, over the age of 80, with no children in the household, and with a net worth of greater than $500,000.  Consumer Reports would rent such a list for approximately $180 per thousand customers listed.

10.     While Consumer Reports profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its customers' privacy and statutory rights because Consumer Reports does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## PARTIES

11.     Plaintiff Robert Watterson is a natural person and citizen of the State of Rhode Island.  Plaintiff Watterson is a subscriber to *Consumer Reports* magazine, which is published by Consumer Reports.  Plaintiff Watterson purchased his subscription to *Consumer Reports* magazine directly from Consumer Reports.  Prior to and at the time he subscribed to *Consumer Reports*, Consumer Reports did not notify Plaintiff Watterson that it discloses the Personal Reading Information of its customers, and Plaintiff Watterson has never authorized Consumer Reports to do so.  Furthermore, Plaintiff Watterson was never provided any written notice that Consumer Reports rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Consumer Reports*, Consumer Reports disclosed, without consent or prior notice, Plaintiff Watterson's Personal Reading Information to data aggregators and data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, Consumer Reports rented or exchanged mailing lists containing Plaintiff Watterson's Personal Reading Information to third parties seeking to contact Consumer Reports subscribers, without first obtaining Plaintiff Watterson's written consent or even giving him prior notice of the rentals, exchanges, and/or

other disclosures.  Because Consumer Reports rented, exchanged, and/or otherwise disclosed his Personal Reading Information, Plaintiff Watterson now receives junk mail from charities and other organizations that do not offer products or services through direct mail.  These unwarranted mailings waste Plaintiff Watterson's time, money, and resources.  These harassing junk mailings received by Plaintiff Watterson are attributable to Consumer Reports' unauthorized rental, exchange, and/or disclosure of his Personal Reading Information.  Because Plaintiff Watterson is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, Consumer Reports' disclosure of his Personal Reading Information deprived Plaintiff Watterson of the full set of benefits to which he was entitled as a part of his *Consumer Reports* subscription, thereby causing economic harm.  Accordingly, what Plaintiff Watterson received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Consumer Reports* subscription had he known that Consumer Reports would disclose his Personal Reading Information.

12.     Defendant Consumer Reports, Inc. is a New York not-for-profit corporation with its principal place of business at 101 Truman Avenue, Yonkers, NY 10703.  Consumer Reports does business throughout Rhode Island, New York, and the entire United States.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Consumer Reports because Consumer Reports conducts substantial business within New York, such that Consumer Reports has significant, continuous, and pervasive contacts with the State of New York.  Additionally, Consumer Reports is a New York not-for-profit corporation, with its principal place of business in Yonkers, New York.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Consumer Reports does substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District, and Consumer Reports' principal place of business is in this District.

## FACTUAL BACKGROUND

### *Rhode Island's Video, Audio, And Publication Rentals Privacy Act*

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     Recognizing the need to further protect its citizens' privacy rights, Rhode Island's legislature enacted the RIVRPA to "prohibit[] the revealing of records relating to the rental of video or audio tapes or publications."  Explanation By The Legislate Council, attached as **Exhibit A**.

18.     Subsection (a) of the RIVRPA states:

> It shall be unlawful for any person to reveal, transmit, publish, or
> disseminate in any manner, any records which would identify the

8

> names and addresses of individuals, with the titles or nature of
> video films, records, cassettes, or the like, which they purchased,
> leased, rented, or borrowed, from libraries, book stores, video
> stores, or record and cassette shops or any retailer or distributor of
> those products, whether or not the identities and listings are kept in
> a remote computing service or electronic storage or the disclosure
> is made through or by a remote computing service.

R.I. Gen. Laws § 11-18-32(a).

19.     Rhode Island's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

20.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act,  18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

21.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

22.     Despite the fact that thousands of Rhode Island residents subscribe to Consumer Reports' publications, Consumer Reports disregarded its legal responsibility by systematically violating the RIVRPA.

### *The Personal Information Market:  Consumers' Personal Information Has Real Value*

23.      In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle

remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting

and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . .

[and] individuals are concerned about being defined by the existing data on themselves."[1]

24.      More than a decade later, Commissioner Swindle's comments ring truer than

ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per

year online advertising industry in the United States.[2]

25.      The FTC has also recognized that consumer data possesses inherent monetary

value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount
> of information collected by businesses, or why their information
> may be commercially valuable. Data is currency. The larger the
> data set, the greater potential for analysis—and profit.[3]

26.      In fact, an entire industry exists while companies known as data aggregators

purchase, trade, and collect massive databases of information about consumers.  Data

aggregators then profit by selling this "extraordinarily intrusive" information in an open and

---

[1] The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at
8:15-11:16, *available at*
https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-
merging-and-exchanging-consumer-data/transcript.pdf (last visited Aug. 30, 2018).

[2] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited Aug. 30, 2018).

[3] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available
at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-
exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Aug. 30, 2018)
(emphasis added).

largely unregulated market.[4]

27.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

28.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

29.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

30.     In their letter, the co-Chairmen recognized that:

---

[4] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Aug. 30, 2018).

[5] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Aug. 30, 2018).

[6] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Aug. 30, 2018).

[7] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Aug. 30, 2018).

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[8]

31.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Consumer Reports share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

32.     Information disclosures like Consumer Reports' are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash

---

[8] *Id.*

[9] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Aug. 30, 2018).

[10] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Aug. 30, 2018).

[11] *Id.*

highes

reserves or other assets to spend on seemingly attractive offers."[12]

33.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Consumer Reports' are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

34.     Consumer Reports is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

35.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

36.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

37.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they

---

[12] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Aug. 30, 2018).

[13] *See id.*

believe do not protect their privacy online.[14] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

38.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

39.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

40.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

41.     Thus, in today's economy, individuals and businesses alike place a real,

---

[14] See *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Aug. 30, 2018).

[15] *Id.*

[16] See Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Aug. 30, 2018).

[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Aug. 30, 2018).

quantifiable value on consumer data and corresponding privacy rights.[18]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *Consumer Reports Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

42.     Consumer Reports maintains a vast digital database comprised of its customers' Personal Reading Information.  Consumer Reports discloses its customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each Consumer Reports customer, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits B-D**).

43.     Consumer Reports then rents and/or exchanges its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

44.     Consumer Reports also discloses its customers' Personal Reading Information to

---

[18] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

data cooperatives, who in turn, give Consumer Reports access to their own mailing list databases.

45.     As a result of Consumer Reports' data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Consumer Reports that identify *Consumer Reports* customers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  Consumer Reports' disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Consumer Reports will rent—to almost any organization willing to pay for it—a list with the names and addresses of all *Consumer Reports* customers who are Jewish, Republican, single, over the age of 80, with a net worth of greater than $500,000, no children in the household, and a history of charitable donations.

46.     Consumer Reports does not seek its customers' prior written consent to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

47.     Consumers can sign up for *Consumer Reports* subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Consumer Reports never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Consumer Reports uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information.

48.     As a result, Consumer Reports disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about

our lives, from our political and religious beliefs to our health concerns"[19] – to anybody willing to pay for it.

49.     By and through these actions, Consumer Reports has intentionally disclosed to third parties its Rhode Island customers' Personal Reading Information without consent, in direct violation of the RIVRPA.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff seeks to represent a class defined as all Rhode Island residents who had their Personal Reading Information disclosed to third parties by Consumer Reports without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

51.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

52.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Consumer Reports is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether Consumer Reports obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Consumer Reports' disclosure of Plaintiff's and the Class's Personal Reading Information violated Rhode

---

[19] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Aug. 30, 2018).

Island General Laws § 11-18-32; and (d) whether Consumer Reports' rental, exchange, and/or disclosure of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

53.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

54.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

55.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Video, Audio and Publication Rentals Privacy Act
### (R.I. Gen. Laws § 11-18-32)

56.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

57.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Consumer Reports.

58.     As a magazine publisher that sells subscriptions to consumers, Consumer Reports is a retailer or distributor of publications.  *See* R.I. Gen. Laws § 11-18-32(a).

59.     By purchasing a subscription to *Consumer Reports*, Plaintiff purchased a publication from Consumer Reports.  *See* R.I. Gen. Laws § 11-18-32(a).

60.     *Consumer Reports* magazine is a publication within the meaning of R.I. Gen. Laws § 11-18-32.

61.     Indeed, Consumer Reports refers to *Consumer Reports* magazine as a "publication."

62.     At all times relevant, and beginning on the dates Plaintiff initiated his *Consumer Reports* subscription, Consumer Reports disclosed Plaintiff's Personal Reading Information, which identified him as a *Consumer Reports* customer, in at least three ways.

63.     First, Consumer Reports disclosed mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Consumer Reports.

64.     Second, Consumer Reports disclosed mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave Consumer Reports access to their

own mailing list databases.

65.     Third, Consumer Reports rented and/or exchanged its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

66.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Consumer Reports was able to increase its profits gained from the mailing list rentals and/or exchanges.

67.     By renting, exchanging, or otherwise disclosing its customer lists, Consumer Reports disclosed to persons other than Plaintiff records which would identify his name and address with the title of the publication he purchased.  *See* R.I. Gen. Laws § 11-18-32(a).

68.     Plaintiff and the members of the Class never consented to Consumer Reports disclosing their Personal Reading Information to anyone.

69.     Worse yet, Plaintiff and the members of the Class did not receive notice before Consumer Reports disclosed their Personal Reading Information to third parties.

70.     On information and belief, Consumer Reports' disclosures of Plaintiff's and the Class's Personal Reading Information were not made pursuant to lawful compulsion.

71.     Consumer Reports' disclosures were not made to other employees of Consumer Reports incident to the normal course of their work.  Consumer Reports' disclosures of Plaintiff's Personal Reading Information were made to third parties, including, but not limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Consumer Reports' revenue.

72. By disclosing Plaintiff's Personal Reading Information, Consumer Reports violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits. *See* R.I. Gen. Laws § 11-18-32(a).

73. Additionally, because Plaintiff and the members of the Class paid for their subscriptions to Consumer Reports' publications, and Consumer Reports was obligated to comply with the RIVRPA, Consumer Reports' unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Consumer Reports' unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

74. Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

75. Accordingly, had Plaintiff been adequately informed of Consumer Reports' disclosure practices, he would not have been willing to purchase his *Consumer Reports* subscription at the price charged, if at all. Thus, Consumer Reports' unlawful disclosures caused Plaintiff economic harm.

76. Consumer Reports' disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements.

77. As a result of Consumer Reports' unlawful disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and economic injuries. On behalf of himself and the Class, Plaintiff seeks: (1) an injunction requiring Defendant

Consumer Reports to obtain consent from Rhode Island customers prior to the disclosure of their

Personal Reading Information as required by the RIVRPA; (2) actual damages or $250.00,

whichever is greater, for each violation, per Class member pursuant to R.I. Gen. Laws § 11-18-

32(d); and (3) costs and reasonable attorneys' fees pursuant to R.I. Gen. Laws § 11-18-32(d).

**COUNT II**
**Unjust Enrichment**

78.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set

forth herein.

79.     Plaintiff brings this claim individually and on behalf of the members of the Class

against Defendant Consumer Reports.

80.     Plaintiff and the Class members conferred benefits on Consumer Reports by

providing Consumer Reports with their Personal Reading Information and paying Consumer

Reports for their magazine publication subscriptions.

81.     Consumer Reports received and retained the information and money belonging to

Plaintiff and the Class when Plaintiff and the Class subscribed to Consumer Reports'

publications.

82.     Because Consumer Reports received and processed Plaintiff's and the Class's

subscription payments and Personal Reading Information, and because Consumer Reports has

employees and/or agents handling customer accounts and billing as well as customer data,

Consumer Reports appreciates or has knowledge of such benefits.

83.     Under the RIVRPA, Plaintiff and the Class members were entitled to

confidentiality in their Personal Reading Information as part of their subscriptions.

84.     Under principles of equity and good conscience, because Consumer Reports

failed to comply with the RIVRPA, Consumer Reports should not be allowed to retain the full

22

amount of money Plaintiff and the Class paid for their subscriptions or the money it received by renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

85.     Moreover, Consumer Reports should not be allowed to retain the monies it received as a result of renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

86.     Plaintiff and the other Class members have suffered actual damages as a result of Consumer Reports' unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

87.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Consumer Reports' failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine publication subscriptions when they otherwise would not have.

88.     Further, a portion of the purchase price of each Consumer Reports magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the RIVRPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

89.     To prevent inequity, Consumer Reports should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money

derived from Consumer Reports' rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

90.     Accordingly, Plaintiff and the Class members seek an order declaring that Consumer Reports' conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Consumer Reports through its rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

91.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

B.     For an order declaring that Defendant's conduct as described herein violates the Video, Audio, And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32;

C.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.     For an award of actual damages or $250, whichever is greater, for each violation, to Plaintiff and each Class member, as provided by the Video, Audio, And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32(d);

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For injunctive relief as pleaded or as the Court may deem proper; and;

H.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated:  September 13, 2018                    Respectfully submitted,

                                             **LAW OFFICES OF PETER N. WASYLYK**

                                             By:    */s/ Peter N. Wasylyk*
                                                      Peter N. Wasylyk

                                             Peter N. Wasylyk
                                             1307 Chalkstone Avenue
                                             Providence, RI 02908
                                             Telephone:  (401) 831-7730
                                             Facsimile:  (401) 861-6064
                                             Email:  pnwlaw@aol.com

                                             **BURSOR & FISHER, P.A.**
                                             Scott A. Bursor*
                                             Joseph I. Marchese*
                                             Philip L. Fraietta*
                                             888 Seventh Avenue
                                             New York, NY  10019
                                             Telephone: (646) 837-7150
                                             Facsimile:  (212) 989-9163
                                             Email:  scott@bursor.com
                                                       jmarchese@bursor.com
                                                       pfraietta@bursor.com

                                             **Pro Hac Vice* Forthcoming

                                             *Attorneys for Plaintiff*